# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**NEAL GOAD,**

      Plaintiff,

   **v.**                                         **Case No. 15-CV-950**

**MILWAUKEE COUNTY,**

      Defendant.

---

## DECISION AND ORDER ON
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Neal Goad was employed by Milwaukee County (the County) as a facilities maintenance worker from February 2012 until December 2015. During the course of Mr. Goad's employment, the County ranked the members of his maintenance crew based on seniority. This ranking was used, among other things, to establish the workers' schedules.

Mr. Goad began his employment ahead of only one crew member on the seniority list, but he then moved to third-to-last after the County hired a new maintenance worker. From June 2013 until September 2013, Mr. Goad was out on medical leave after breaking his arm. Mr. Goad's supervisor erroneously believed that this leave period did not count as accrued time toward the County's seniority system. Consequently, by the time Mr. Goad returned from leave, he had been passed by the only two co-workers beneath him in seniority.

As the last-ranked crew member, Mr. Goad had the worst schedule. He was frequently required to return to work just eight hours after finishing a shift. As a result, Mr. Goad became sleep deprived, depressed, anxious, and irritable. When Mr. Goad complained about his schedule, he learned that the supervisor erred in holding the missed time against him. By that time, however, Mr. Goad did in fact have the least amount of seniority on his crew. Mr. Goad was eventually terminated following an altercation with a co-worker.

Following his termination, Mr. Goad filed suit in federal court, alleging that the County interfered with his rights under the Family and Medical Leave Act (FMLA) of 1993 and the ADA Amendments Act (ADAAA) of 2008 and retaliated against him for exercising his FMLA rights. The County has moved for summary judgment on all of Mr. Goad's claims. For the reasons that follow, the Court finds that the County is entitled to summary judgment on Mr. Goad's FMLA retaliation and ADAAA claims but not his FMLA interference claim. The County's motion will therefore be granted in part and denied in part, as explained below.

## I.    Factual Background[1]

On February 12, 2012, Milwaukee County hired Neal Goad as a facilities maintenance worker. Defendant's Proposed Findings of Fact in Support of Its Motion for Summary Judgment (Def.'s Facts) ¶¶ 1–2, ECF No. 30. In that capacity,

---

[1] This factual background is taken from the parties' statements of fact and the responses thereto. The Court notes that the County filed a reply in support of its own facts. *See* Defendant's Replies to Plaintiff's Responses to Defendant's Proposed Findings of Fact, ECF No. 36. This document was not necessary to the disposition of

*(continued on next page)*

Mr. Goad was responsible for lawn care, salting, snow removal, light bulb replacement, general maintenance, and grounds maintenance. Def.'s Facts ¶ 3. Mr. Goad's initial assignment was at the Vel R. Phillips Juvenile Justice Center, labeled by the County as Facilities West. Def.'s Facts ¶ 4.

The County used a seniority system for its facilities maintenance workers. *See* Def.'s Facts ¶¶ 10–16. Workers were ranked based on the hours they had accrued, excluding overtime. This ranking was used, in part, to determine the workers' schedules. Workers with the same number of seniority hours were ranked based on the last four digits of their social security numbers: the worker with the highest number received the highest seniority ranking and so on and so forth.

Mr. Goad was initially (and incorrectly) ranked second-to-last on his maintenance crew, ahead of only Devin Richard. *See* Def.'s Facts ¶ 22. Although both were hired and began work on the same day, Mr. Richard's social security number is higher than Mr. Goad's, entitling Mr. Richard to higher seniority under the applicable work rules. Def.'s Facts ¶ 23. But for the County's mistake, Mr. Goad would have been the lowest ranked facilities maintenance worker at the outset of his employment. Def.'s Facts ¶ 24.

In May 2013, Mr. Goad broke his arm. Plaintiff's Proposed Findings of Fact (Pl.'s Facts) ¶ 4, ECF No. 33. He informed his supervisor, Jason McCarthy, of the

---

the motion and is not ordinarily permitted by this district's local rules. *See* E.D. Wis. Civil L. R. 7(i) & 56(b)(3). As such, it will not be referred to herein. *See, e.g.*, *J.M. v. City of Milwaukee*, 249 F. Supp. 3d 920, 933 n.8 (E.D. Wis. 2017) (noting that such replies are "neither contemplated nor permitted by this District's Local Rules").

injury and indicated that he needed time off to allow his arm to heal. Pl.'s Facts ¶ 4. Mr. Goad took a leave of absence under the FMLA. *See* Amended Complaint ¶ 10, ECF No. 13. On August 9, 2013, Mr. Goad's doctor told him that he could return to work on September 3, 2013. Am. Compl. ¶ 11. When Mr. Goad called Mr. McCarthy to inform him of his impending return to work, Mr. McCarthy told Mr. Goad that he had "lost time" as a result of his unpaid leave. *See* Am. Compl. ¶ 12–14; Pl.'s Facts ¶ 5; Def.'s Facts ¶¶ 26, 28–33. Mr. Goad therefore would have the least amount of seniority of the workers on his maintenance crew upon his return.

When Mr. Goad returned to work as planned in September 2013, he was listed last on the schedule, immediately behind Mr. Richard and Derrick Watson, a maintenance worker who started in late February 2012—two weeks after Mr. Goad and Mr. Richard. *See* Def.'s Facts ¶¶ 25, 40. Facilities workers were scheduled for multiple different shifts (i.e., first, second, or third) during the same two-week pay period, which sometimes required them to return to work just eight hours after finishing a shift. *See* Am. Compl. ¶ 15–17; Pl.'s Facts ¶ 7; Def.'s Facts ¶ 57–58. Mr. Goad was informed during the interview process that the facilities maintenance position involved working such "swing shifts." Def.'s Facts ¶ 58.

Upon his return, Mr. Goad was required to work more swing shifts than he had prior to taking FMLA leave. Pl.'s Facts ¶ 7. Before going out on leave, Mr. Goad had worked twelve swing shifts; he worked fourteen such shifts upon his return. Similarly, upon his return, Mr. Goad was required to work more swing shifts than his closest peers in seniority. Prior to Mr. Goad's leave, Mr. Richard had worked

fifteen swing shifts while Mr. Watson had worked twelve. After Mr. Goad returned, Mr. Richard worked four and Mr. Watson worked five.[2] *See* Pl.'s Facts ¶¶ 40–50; Def.'s Facts ¶¶ 42–48, 61–71 (citing Exhibit 11 to Declaration of Kristofor L. Hanson, ECF No. 28-11).

In Spring 2014, Mr. Goad learned that he should not have lost seniority for taking unpaid leave. *See* Pl.'s Facts ¶¶ 8–11. He subsequently called Mr. McCarthy to question why he was last on the schedule. *See* Am. Compl. ¶ 20; Pl.'s Facts ¶¶ 22–24, 26, 30–31; Def.'s Facts ¶¶ 94–99. Mr. McCarthy explained that Mr. Goad and Mr. Richard had the least amount of time accrued, but Mr. Goad was listed last as a result of the County's tiebreaking system. By that time, Mr. McCarthy had learned that unpaid leave time did not affect seniority. *See* Plaintiff's Response to Def.'s Facts ¶ 99, ECF No. 34 (citing Exhibit 9 to Declaration of Brenda Lewison, ECF No. 35-9). On June 10, 2014, Mr. Goad received a written reprimand for the conduct he exhibited during his phone conversation with Mr. McCarthy. Am. Compl. ¶ 21; Pl.'s Facts ¶ 25; Def.'s Facts ¶ 93.

Mr. Goad claims that he developed "swing shift syndrome" (also known as shift work disorder) as a result of having to work more swing shifts. *See* Am. Compl. ¶ 18. This condition "is characterized by depression, anxiety, irritability, and sometimes, increased absenteeism and accidents due to sleep deprivation." *Id.* Mr. Goad testified, however, that he did not inform anyone at the County about his medical conditions. Def.'s Facts ¶¶ 86–88 (citing Exhibit 3 to Supplemental

---

[2] Mr. Watson was transferred from Facilities West on February 8, 2014. *See* Def.'s Facts ¶¶ 43, 55, 67; Defendant's Responses to Pl.'s Facts ¶ 48, ECF No. 37.

Declaration of Kristofor L. Hanson, ECF No. 39-3 at 13). But he did take advantage of the County's Employee Assistance Program—a program used to provide employees with opportunities to address workplace issues, *see* Def.'s Facts ¶ 119— and voluntarily sought mental health treatment for depression and anxiety, *see* Am. Compl. ¶ 22; Pl.'s Facts ¶ 21.

Mr. Goad continuously had conflicts with co-workers while stationed at Facilities West. Def.'s Facts ¶¶ 91–95. The conflicts became so disruptive that Gary Waszak, the facilities maintenance manager, decided to consult the human resources manager assigned to the facilities division, Sean Moore. Def.'s Facts ¶¶ 34, 79, 117. Given the concerns from Mr. Goad's supervisors, in October 2014, Mr. Moore determined that Mr. Goad should participate in the Employee Assistance Program. *See* Def.'s Facts ¶¶ 115–18. He issued the mandatory referral during a meeting he arranged with Mr. Goad and Mr. Waszak. Pl.'s Facts ¶ 33. During that meeting, Mr. Goad indicated that he was already seeing someone from the Employee Assistance Program and questioned why he had to see someone else. Pl.'s Facts ¶ 34.

The mandatory referral letter, which was addressed to Mr. Goad, stated as follows: "A review of your past/current performance has indicated a problem with/history of not following directions of [your] supervisor, raising your voice and being defensive and accusatory with your supervisor, having a poor attitude and not being helpful with clients when responding to work orders." *See* Exhibit 12 to Hanson Decl., ECF No. 28-13 at 5–6. The letter also described Mr. Goad's specific

behavioral problems, indicated that Mr. Goad would be referred to a licensed clinician or treatment facility "to help address the workplace issues," and emphasized that Mr. Goad's compliance with any recommended "treatment" was mandatory. *Id.*; *see also* Pl.'s Facts ¶ 56.

Upon returning to work following the mandatory referral, Mr. Goad was involuntarily transferred to the Milwaukee County Courthouse. Def.'s Facts ¶¶ 5, 91, 125. Mr. Goad was pleased with his new schedule at the Courthouse, but he continued to have problems with co-workers. *See* Def.'s Facts ¶¶ 126–27. For example, on March 17, 2015, Mr. Goad slapped a radio out of the hands of Anthony Dailey. Def.'s Facts ¶¶ 128–30; *see also* Am. Compl. ¶¶ 30–32. The following day, Mr. Goad and Mr. Dailey were involved in a verbal confrontation while working at the Courthouse loading dock. Def.'s Facts ¶ 135; *see also* Am. Compl. ¶¶ 33–35.

The incidents between Mr. Goad and Mr. Dailey were investigated by Mary Beth Buechel, the County's human resources business partner. *See* Def.'s Facts ¶¶ 134–39 (citing Exhibit 13 to Hanson Decl., ECF No. 28-14). Mr. Dailey received a written reprimand for his actions. Ms. Buechel determined, however, that Mr. Goad escalated the March 17 incident and instigated the one on March 18. Based on those findings, as well as Mr. Goad's prior discipline, on April 21, 2015, Ms. Buechel recommended that Mr. Goad be discharged. Ex. 13; *see also* Pl.'s Facts ¶ 61; Def.'s Facts ¶ 137. Ms. Buechel listed Mr. Goad's mandatory referral to the Employee Assistance Program as "prior discipline." *See* Ex. 13 at 3; *see also* Pl.'s Facts ¶ 59.

Ms. Buechel prepared the written charges, which were signed by Jeremy Theis, the County's director of facilities management, on May 21, 2015. *See* Exhibit A to Declaration of Mary Beth Buechel, ECF No. 25-1; *see also* Def.'s Facts ¶ 147. The charges stemmed from the March 18, 2015 verbal confrontation with Mr. Dailey; the March 17, 2015 physical confrontation with Mr. Dailey; the June 2014 written reprimand; and the October 2014 mandatory referral. Ex. A. Mr. Goad was suspended without pay pending the final decision of the County's Personnel Review Board. Ex. 12 at 1.

Following several hearings, on December 8, 2015, the Review Board upheld the charges for discharge. *See* Exhibit B to Buechel Decl., ECF No. 25-2; Pl.'s Facts ¶ 63; Def.'s Facts ¶¶ 147–49. The Review Board determined that Mr. Goad had violated the following civil service rules of the County: threatening, intimidating, coercing, or harassing employees or supervision at any time; interference with normal work flow or departmental procedures; indecent, criminal, or inappropriate conduct on county premises during working hours; and offensive conduct or language toward the public or toward county officers or employees. Ex. B at 2. The Review Board's decision also referenced the mandatory referral and questioned why the investigation of the charges against Mr. Goad took so long. *See* Ex. B at 5–7.

## II. Procedural Background

Mr. Goad filed the present action on August 7, 2015, *see* Complaint, ECF No. 1, and he timely filed an amended complaint on April 1, 2016, *see* Scheduling Order, ECF No. 12. The matter was reassigned to this Court in August 2016 after the

parties consented to magistrate judge jurisdiction. *See* Consent to Proceed Before a Magistrate Judge, ECF Nos. 15, 16 (citing 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b)).

In his Amended Complaint, Mr. Goad alleges that the County "interfered with [his] rights as guaranteed under the Family and Medical Leave Act (FMLA), the Americans with Disabilities Act, as amended (ADAAA), the Rehabilitation Act, and the Age Discrimination in Employment Act and retaliated against him for his use of those rights." Am. Compl. ¶ 42. He seeks lost wages, damages, and equitable relief. Am. Compl. ¶¶ 43–44.

On May 12, 2017, the County filed a motion for summary judgment on all of Mr. Goad's claims. Defendant's Motion for Summary Judgment, ECF No. 24; *see also* Defendant's Brief in Support of Its Motion for Summary Judgment, ECF No. 29. In responding to the County's motion, Mr. Goad expressly abandoned his age discrimination claim but continued to press his FMLA claims and his disability discrimination claim. *See* Plaintiff's Brief in Response to Defendant's Motion for Summary Judgment 1, ECF No. 31. The County filed its reply brief on July 11, 2017. Defendant's Reply Brief in Support of Its Motion for Summary Judgment, ECF No. 38. Accordingly, the matter is now ready for disposition.

## III. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those that, under the

applicable substantive law, "might affect the outcome of the suit." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A moving party "is entitled to a judgment as a matter of law" when "the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (first internal quotation marks omitted). Still,

> a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* (internal quotation marks omitted).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Liberty Lobby*, 477 U.S. at 255). "However, [the court's] favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (quoting *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 306 (7th Cir. 2012)). That is, "to survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable

jury could return a verdict' in [his] favor." *Fitzgerald*, 707 F.3d at 730 (quoting

*Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 822 (7th Cir. 2011)).

## IV. Discussion

Mr. Goad claims that the County interfered with his FMLA rights and

retaliated against him for taking FMLA leave by demoting his seniority within the

facilities maintenance crew. He also claims that the County violated the ADAAA

when it terminated his employment. The County seeks summary judgment on all of

these claims.

### A. Whether Milwaukee County is entitled to summary judgment on Mr. Goad's FMLA interference claim

Mr. Goad maintains that the County interfered with his FMLA rights

because after he returned from leave he lost seniority and was required to work

disproportionally more swing shifts than Mr. Richard and Mr. Watson, his two

closest peers in seniority on the facilities maintenance crew. Pl.'s Br. 15–16.

"To prevail on an FMLA interference claim, an employee need only show that

his employer deprived him of an FMLA entitlement; no finding of ill intent is

required." *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006) (citing *Hoge v.

Honda Am. Mfg., Inc.*, 384 F.3d 238, 244 (7th Cir. 2004)). Specifically, the employee

must establish that: "(1) he was eligible for the FMLA's protections, (2) his employer

was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he

provided sufficient notice of his intent to take leave, and (5) his employer denied

him FMLA benefits to which he was entitled." *Id.* The County does not contest the

first four requirements. *See* Def.'s Br. 17. The only issue is whether the County improperly denied benefits to which Mr. Goad was entitled.

The FMLA "provides eligible employees of a covered employer the right to take unpaid leave for a period of up to twelve work weeks in any twelve[-]month period for a serious health condition." *King v. Preferred Tech. Grp.*, 166 F.3d 887, 891 (7th Cir. 1999) (citing 29 U.S.C. § 2612(a)(1)). The Act "also requires that an employee be reinstated to his former position or an equivalent one upon returning from leave." *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 977 (7th Cir. 2008) (citing 29 U.S.C. § 2614(a)(1)). It is "unlawful for an employer to interfere with these entitlements." *Breneisen*, 512 F.3d at 977 (citing 29 U.S.C. § 2615(a)(1)).

"The test for equivalence is strict." *Breneisen*, 512 F.3d at 977. Jobs are equivalent within the meaning of the FMLA only "if they entail 'equivalent employment benefits, pay, and other terms and conditions of employment.'" *Breneisen*, 512 F.3d at 977 (quoting 29 U.S.C. § 2614(a)(1)(B)). The undisputed facts demonstrate that Mr. Goad had the same benefits and pay upon his return from FMLA leave. The parties dispute whether the terms and conditions of Mr. Goad's employment were equivalent given his placement on the bottom of the seniority list.

"An equivalent position must have substantially similar duties, conditions, responsibilities, privileges and status as the employee's original position." 29 C.F.R. § 825.215(e). As such, an employee returning from leave "is ordinarily entitled to return to the same shift or the same or an equivalent work schedule." 29 U.S.C.

§ 825.215(e)(2). The equivalence requirement, however, "does not extend to de minimis, intangible, or unmeasurable aspects of the job." 29 C.F.R. § 825.215(f).

Upon returning from FMLA leave in September 2013, Mr. Goad was placed at the bottom of the seniority list, immediately behind Mr. Richard and Mr. Watson. As a result, Mr. Goad was required to work more swing shifts than he had prior to taking leave. In the sixteen-month period prior to taking leave, Mr. Goad worked twelve swing shifts. Mr. Goad acknowledged that his schedule improved after he was transferred to the Milwaukee County Courthouse in October 2014. Accordingly, the issues with his schedule persisted for fourteen months. During that period, Mr. Goad worked fourteen swing shifts.

By comparison, before Mr. Goad went out on leave, Mr. Richard worked fifteen swing shifts while Mr. Watson worked twelve. After Mr. Goad returned from leave, Mr. Richard worked only four swing shifts; Mr. Watson worked five before he was transferred from Facilities West in February 2014. The following charts depict these comparisons:

**Table 1 - Number of swing shifts worked**

|  | Mr. Goad | Mr. Richard | Mr. Watson |
|---|---|---|---|
| Feb. 2012 – May 2013 | **12** | **15** | **12** |
| Sept. 2013 – Oct. 2014 | **14** | **4** | **5**[*] |

---

[*] Through February 8, 2014.

**Table 2 - Average number of swing shifts worked per month**

|  | Mr. Goad | Mr. Richard | Mr. Watson |
|---|---|---|---|
| Feb. 2012 – May 2013 | **0.7500** | **0.9375** | **0.7500** |
| Sept. 2013 – Oct. 2014 | **1.0000** | **0.2857** | **0.9524**[**] |

The above figures show that, prior to Mr. Goad's leave, the swing shifts were split relatively evenly between the three maintenance workers. Upon his return, however, Mr. Goad was required to work more swing shifts than Mr. Richard or Mr. Watson. A reasonable jury could therefore conclude that Mr. Goad's position upon returning from FMLA leave was not equivalent to his pre-leave position. Accordingly, this case is distinguishable from *Karaffa v. Montgomery Twp.*, CIVIL ACTION No. 12-1184, 2013 U.S. Dist. LEXIS 39185 (E.D. Pa. Mar. 21, 2013), a case relied upon by the County.

The County argues that, to the extent Mr. Goad worked more swing shifts after returning from leave, "the difference is *de minimis*." *See* Def.'s Br. 19–21; Def.'s Reply 4–7. According to the County, Mr. Goad was incorrectly listed ahead of Mr. Richard on the schedule prior to taking leave due to an error in how the County applied its seniority tiebreaking system. Thus, after Mr. Watson was transferred from Facilities West in February 2014, the schedule was correct: Mr. Goad was properly listed last, directly below Mr. Richard. During the only period when Mr. Goad was improperly listed lower on the schedule than he should have been

---

[**] 0.9524 = 5 swing shifts / 5.25 months.

(September 2013 through February 8, 2014), he worked "*just three*" more swing shifts than Mr. Watson. Def.'s Reply 5. "These differences become even more *de minimis*," according to the County, "when the number of multiple shifts these workers were scheduled to work during each two-week pay period is taken into account." Def.'s Reply 6.

The County's arguments are unavailing for several reasons. *First*, whether Mr. Goad's placement on the schedule resulted from a mistake or an intentional act is irrelevant to his FMLA interference claim. *See Burnett*, 472 F.3d at 477 (noting that ill intent is not a required to prove an FMLA interference claim). *Second*, the County did not realize its misapplication of the tiebreaking system until Spring 2014 when Mr. Goad started complaining about being placed last on the schedule— that is, after the mistake was self-corrected upon Mr. Watson's transfer. It is unknown when (or if) the County would have discovered this mistake had Mr. Goad not been improperly demoted. It is therefore reasonable to infer that Mr. Goad would have been listed ahead of both Mr. Richard and Mr. Watson if the County had (correctly) not held his taking FMLA leave against him, just as he was prior to taking leave. The County's suggestion that Mr. Goad "was not entitled to return to" the schedule he had prior to taking leave is therefore based on an unreasonable assumption.

*Third*, the County's argument rests on a misunderstanding of how the Court views the evidence. At this stage in the proceedings, the Court must construe all facts in the light most favorable to Mr. Goad, the non-moving party, and draw all

reasonable inferences in his favor. In defining the relevant periods of comparison, the County essentially asks the Court to consider the evidence in its favor. That would be improper. The evidence, when viewed in favor of Mr. Goad, shows that he worked more swing shifts upon his return from leave and worked disproportionately more swing shifts than either Mr. Richard or Mr. Watson.

*Finally*, even if the Court were to adopt the County's periods of comparison, a reasonable jury still could conclude that Mr. Goad was not reinstated to an equivalent position upon his return for leave. The average number of swing shifts Mr. Goad worked per month increased from 0.7500 to 1.0000 upon his return. From September 2013 through February 8, 2014, Mr. Goad worked three more swing shifts than Mr. Watson. Thus, Mr. Goad averaged 1.5238 swing shifts per month over that period while Mr. Watson averaged 0.9524. During this same time period, Mr. Richard worked only one swing shift, an average of 0.1905 per month. The County has not provided any explanation for why the Court should ignore the stark difference in schedules between Mr. Goad and Mr. Richard before and after Mr. Goad's leave.

The Court cannot say that these differences are *de minimis* as a matter of law. At best, the County's interpretation of the evidence creates a factual dispute on the equivalence issue. The County therefore is not entitled to summary judgment on Mr. Goad's FMLA interference claim.

## B. Whether Milwaukee County is entitled to summary judgment on Mr. Goad's FMLA retaliation claim

Mr. Goad similarly maintains that the County placed him at the bottom of seniority list in retaliation for his taking FMLA leave. Pl.'s Br. 16–17. The County argues that Mr. Goad's placement at the bottom of the seniority list does not constitute a materially adverse employment action under the FMLA. Def.'s Br. 9–12; Def.'s Reply 8–10. The County further argues that Mr. Goad's loss of seniority was an unintentional error, not payback for his taking leave. Def.'s Br. 13–16; Def.'s Reply 7–8.

It is unlawful for employers to discriminate against an employee who has exercised his FMLA rights. *See* 29 U.S.C. § 2615(a)(2). "A retaliation claim requires proof of discriminatory or retaliatory intent, which can be established directly or indirectly." *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 828 (7th Cir. 2012) (citing *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005)). "To establish a prima facie case using the direct method, [the employee must] 'present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two.'" *Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 799 (7th Cir. 2014) (quoting *Scruggs v. Carrier Corp.*, 688 F.3d 821, 826 (7th Cir. 2012)). Under the indirect method, the employee must present evidence that (1) he was meeting the employer's legitimate expectations; (2) he suffered an adverse employment action; and (3) he was treated less favorably than similarly situated employees who did not request FMLA leave. *See*

*Langenbach*, 761 F.3d at 800 (citing *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 592 (7th Cir. 2008)).

The United States Court of Appeals for the Seventh Circuit has consistently held that "the adverse action giving rise to an FMLA retaliation claim" must be "materially adverse." *Cole v. Illinois*, 562 F.3d 812, 816 (7th Cir. 2009). "Materially adverse actions are not limited to employment-related activities but include any actions that would dissuade a reasonable employee from exercising his rights under the FMLA." *Breneisen*, 512 F.3d at 979 (citing *Burlington N. & Sante Fe Ry. v. White*, 548 U.S. 53, 57 (2006)); *see also Thomas v. Potter*, 202 F. App'x 118, 119 (7th Cir. 2006) (applying Title VII's analogous materiality requirement). According to the Seventh Circuit, a reassignment that does not affect the employee's pay or promotion opportunities ordinarily does not constitute a material adverse employment action. *See Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005).

A reassignment, however, may be material if the employee presents evidence that his employer "sought to exploit a 'known vulnerability' by altering [his] work schedule upon return from FMLA leave." *Langenbach*, 761 F.3d at 799–800 (citing *Porter v. City of Chicago*, 700 F.3d 944, 955 (7th Cir. 2012); *Washington*, 420 F.3d at 662); *see also Thomas*, 202 F. App'x at 119; *Koty v. Zaruba*, No. 15 C 2600, 2017 U.S. Dist. LEXIS 152207, at *33–34 (N.D. Ill. Sept. 19, 2017); *Wink v. Miller Compressing Co.*, Case No. 14-CV-367, 2015 U.S. Dist. LEXIS 70491, at *19–20 (E.D. Wis. June 1, 2015). For example, the Seventh Circuit determined that a

reasonable jury could conclude that the Illinois Department of Revenue set out to exploit a known vulnerability of its former employee, Chrissie Washington, when it altered her work schedule after she returned from unpaid leave. *Washington*, 420 F.3d at 662–63. Despite knowing that Ms. Washington needed a flexible schedule so that she could care for her disabled son, the Department reassigned her to a position with a standard 9-to-5 schedule. This scheduling change resulted in Ms. Washington having to exhaust all of her vacation and sick leave before she found a new supervisor who allowed her to work from 7:00 a.m. to 3:00 p.m..

Here, Mr. Goad has failed to demonstrate that his placement on the bottom of the seniority list constituted a materially adverse employment action. The undisputed facts show that this reassignment did not result in "a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." *Porter*, 700 F.3d at 954. Mr. Goad claims that the increase in swing shifts caused him to be sleep deprived and to be sick so often that he had to take unpaid leave. But he has not provided any evidence to suggest that he was more vulnerable than the average person to lack of sleep, let alone that the County was aware of such vulnerability and sought to exploit it. *See Koty*, 2017 U.S. Dist. LEXIS 152207, at *33–34 (denying ADA retaliation claim where employee was reassigned to the midnight shift upon his return from leave because, "[w]hile losing sleep is certainly an annoyance, the schedule change does not rise to the level of an adverse action"). This case is therefore distinguishable from *Washington*.

Accordingly, any effects Mr. Goad suffered from being placed on the bottom of the seniority list do not rise to the level of harm sufficiently serious to dissuade a reasonable employee to forego exercising his rights under the FMLA. *See Burlington N.*, 548 U.S. at 68 (adopting materiality standard articulated by the Seventh Circuit in *Washington*). The County is therefore entitled to summary judgment on Mr. Goad's FMLA retaliation claim.[3]

### C. Whether Milwaukee County is entitled to summary judgment on Mr. Goad's ADAAA claim

Mr. Goad also claims that the County discharged him because he had, or was perceived to have, a disability. Pl.'s Br. 18–19.

"The ADA makes it unlawful for an employer to discriminate against a 'qualified individual on the basis of disability.'" *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 480 (7th Cir. 2017) (quoting 42 U.S.C. § 12112(a)). "A plaintiff claiming disparate treatment in violation of the ADA can rely on two different methods of proof to survive a summary judgment motion." *Bunn v. Khoury Enters.*, 753 F.3d 676, 683 (7th Cir. 2014). Mr. Goad has not identified any similarly situated co-worker. Thus, it appears he is proceeding under the direct method of proof.

To establish disparate treatment via the direct method, the employee must show: (1) that he is disabled within the meaning of the Act; (2) that he is qualified to perform the essential functions of the job with or without accommodation; and

---

[3] Because Mr. Goad has failed to establish the second requirement of an FMLA retaliation prima facie case, the Court does not need to address whether the County acted with retaliatory intent when it reduced his seniority.

(3) that he has suffered an adverse employment action because of his disability.

*Bunn*, 753 F.3d at 683 (citing *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1127

(7th Cir. 2006)). An employee survives a motion for summary judgment only if he

presents "the court with evidence that, if believed by a trier of fact, would establish

all three elements of his claim." *James v. Hyatt Regency Chi.*, 707 F.3d 775, 782 (7th

Cir. 2013).

Mr. Goad has failed to provide sufficient evidence from which a reasonable

jury could conclude that the County discriminated against him because he had, or

was regarded to have, a disability. For one, Mr. Goad has not produced any evidence

to satisfy the first two elements of an ADAAA claim. He vaguely claims to have

suffered from "swing shift syndrome" but has not provided any evidence to support

this allegation. Moreover, none of the circumstantial evidence Mr. Goad has

presented is sufficient to create a genuine issue of fact as to whether he was

terminated on account of a disability.

Mr. Goad claims in his declaration that he told Mr. Moore, the human

resources manager assigned to the facilities division, that he was sleep-deprived,

anxious, and frequently ill from having to work so many swing shifts. *See*

Declaration of Neal Goad ¶¶ 14–15, ECF No. 32. But this claim directly contradicts

Mr. Goad's deposition testimony, in which he testified that he did not tell anyone at

the County about any of his medical conditions. *See* Ex. 3 at 13.

Mr. Goad also indicates that Mr. Moore and Mr. Waszak knew he was getting

help from the Employee Assistance Program prior to the mandatory referral. While

true, this fact does not establish that the County knew Mr. Goad had a medical condition, let alone a disability within the meaning of the ADAAA. The County's Employee Assistance Program was used to address a wide range of workplace issues. Mr. Goad has not provided any evidence that he told Mr. Moore or Mr. Waszak that he was seeking mental health treatment through the program.

To further support his disparate treatment claim, Mr. Goad points out that the mandatory referral to the Employee Assistance Program required him to seek treatment and that this referral formed part of the basis for discharge. Although the referral letter did use the term "treatment," the referral was clearly designed to address Mr. Goad's behavioral issues and conflicts with others. *See* Ex. 12 at 5–6. Treatment in this sense simply meant that Mr. Goad had to attend counseling sessions and comply with the provider's recommendations. The letter did not reference any medical condition. Consequently, Ms. Buechel's listing of the mandatory referral under the category of "prior discipline," *see* Ex. 13, does not suggest that Mr. Goad was disciplined for having a disability. Rather, this reference accurately captured Mr. Goad's ongoing workplace issues with supervisors, co-workers, and clients.

Finally, Mr. Goad claims that the encounter with Mr. Dailey was a pretext for a discriminatory discharge. Mr. Goad asserts that, during the investigation into that incident, Mr. Waszak asked him what medications he was taking. *See* Goad Decl. ¶ 37. He further asserts that the length of the investigation—approximately

seven weeks—creates suspicion that the County was using that time to devise a non-discriminatory reason for his discharge.

Mr. Goad's pretext argument is unavailing. The disciplinary proceedings demonstrate one inescapable conclusion: Mr. Goad was discharged due to his history of workplace violations. *See* Ex. B. The violent encounter with Mr. Dailey was merely the final straw.

Because Mr. Goad has not produced evidence from which a reasonable jury could conclude that he was discharged because of his disability, the County is entitled to summary judgment on his ADAAA claim.

## V.    Conclusion

For all the foregoing reasons, the Court finds that the County is entitled to summary judgment on Mr. Goad's FMLA retaliation and ADAAA claims. The County is not, however, entitled to summary judgment on Mr. Goad's FMLA interference claim. Its motion will therefore be granted in part and denied in part.

**NOW, THEREFORE, IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment, ECF No. 24, is **GRANTED in part** and **DENIED in part**, as stated herein.

Dated at Milwaukee, Wisconsin, this <u>21st</u> day of March, 2018.

**BY THE COURT:**

<u>*s/ David E. Jones*</u>
DAVID E. JONES
United States Magistrate Judge